DECISION
{¶ 1} Relator, Ronald Crabtree, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate that portion of its order denying payment for the prescription drugs Lexapro, Oxycontin, and Talwin beginning February 2004, and to enter an order granting payment for said prescription drugs.
 {¶ 2} Pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including *Page 2 
findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate found that because there was some evidence that these prescription drugs were not causally linked to the originally-allowed conditions, and because relator failed to present any medical evidence showing that the newly-allowed allowed condition was causally linked to the prescription drugs at issue, the commission did not abuse its discretion in denying payment. Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.
 {¶ 3} Both relator and respondent, MTD Products, Inc., filed objections to the magistrate's decision. We will first address relator's objection.
 {¶ 4} Relator argues that the magistrate should have found the commission abused its discretion by relying on Dr. Kepple's report. Relator contends that the commission could not rely on Dr. Kepple's report for any purpose because Dr. Kepple failed to consider all the allowed conditions in the claim. We disagree.
 {¶ 5} Contrary to relator's contention, the commission did not abuse its discretion by relying on Dr. Kepple's report in assessing the causal link between the prescription drugs at issue and the originally-allowed conditions identified by Dr. Kepple. Specifically, Dr. Kepple opined that the narcotics Oxycontin and Talwin are no longer appropriate for the originally-allowed conditions he listed, and that Lexapro is not an appropriate treatment for the originally-allowed conditions he listed. The commission could rely on Dr. Kepple's report for the conditions it addresses. Therefore, there is some evidence supporting the commission's decision to deny payment for the prescription drugs for the originally-allowed conditions identified in Dr. Kepple's report.
 {¶ 6} We recognize that Dr. Kepple's listing of the allowed conditions fails to include the newly-allowed condition of "degenerative disc disease at L5-S1." Therefore, *Page 3 
the commission could not rely on Dr. Kepple's report in assessing the appropriateness of these prescription drugs for that condition. It is unclear whether the staff hearing officer ("SHO") recognized that Dr. Kepple did not list all the allowed conditions. Nevertheless, relator must still present some evidence that these prescriptions drugs are indicated for treating the newly-allowed condition. As noted by the magistrate, relator failed to present any evidence that the newly-allowed condition, "degenerative disc disease at L5-S1," is causally linked to the prescription drugs at issue. Therefore, we agree with the magistrate that the commission did not abuse its discretion in denying relator's request for payment for the prescription drugs Lexapro, Oxycontin, and Talwin, beginning February 2004.
 {¶ 7} Nor does State ex rel. Richardson v. Quarto Mining Co. (1995),73 Ohio St.3d 358 require a different conclusion. InRichardson, the medical report relied upon by the commission to terminate temporary total disability ("TTD") (based upon the claimant having reached maximum medical improvement) did not identify all the allowed conditions. Therefore, the Supreme Court of Ohio held that the commission abused its discretion in relying solely upon that report to terminate TTD. The issue presented in the case at bar is quite different. Although the commission could not rely upon Dr. Kepple's report in assessing the causal link between the prescription drugs at issue and the newly-allowed condition, it could rely on Dr. Keppel's report for the conditions he addresses. In addition, relator failed to introduce any evidence establishing a causal link between the newly-allowed condition not addressed in Dr. Kepple's report and the prescription drugs at issue. Without some evidence establishing this causal link, relator is not entitled to payment for these prescription drugs.
 {¶ 8} Accordingly, we overrule relator's objection. *Page 4 
 {¶ 9} Respondent MTD Products, Inc., objects to both the magistrate's findings of fact and conclusions of law. With respect to the magistrate's factual findings, respondent points out that the date of relator's worker's compensation injury was April 9, 1991 — not April 9, 2001 as stated in the magistrate's findings of fact. We agree with respondent that relator's date of injury was April 9, 1991. Therefore, we sustain respondent's objection to the magistrate's findings of fact.
 {¶ 10} Because we have overruled relator's objection, adopted the magistrate's decision, and denied the writ of mandamus, respondent's objection to the magistrate's conclusions of law (which presents alternative grounds for finding that the commission did not abuse its discretion) is overruled as moot.
 {¶ 11} Following an independent review of this matter, we find that the magistrate has properly determined the facts, except that the date of relator's worker's compensation injury was April 9, 1991 — not April 9, 2001. We also find that the magistrate applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact (as modified) and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.
Relator's objection overruled; respondent's MTD Products, Inc.objections sustained in part and overruled in part; and writ of mandamusdenied.
 BRYANT and FRENCH, JJ., concur. *Page 5 
 MAGISTRATE'S DECISION Rendered on December 22, 2006 IN MANDAMUS {¶ 12} In this original action, relator, Ronald Crabtree, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate that portion of its order denying payment for the prescription drugs Lexapro, Oxycontin and Talwin beginning February 2004, and to enter an amended order granting payment for those prescription drugs. *Page 6 
Findings of Fact: {¶ 13} 1. On April 9, 2001, relator sustained an industrial injury while employed as an assembler for respondent MTD Products, Inc. ("MTD"), a self-insured employer under Ohio's workers' compensation laws.
 {¶ 14} 2. The industrial claim was initially allowed for "lumbar sprain with secondary disc herniation of L5/S1; contusion, left foot; left knee internal derangement," and was assigned claim number L90015-22.
 {¶ 15} 3. On February 10, 2004, relator's treating physician, Sam N. Ghoubrial, M.D., completed and signed a co-called "Medical Interrogatory." The "Medical Interrogatory" asks Dr. Ghoubrial to respond "yes" or "no" to several pre-printed questions apparently drafted by relator's counsel. The "Medical Interrogatory," as completed by Dr. Ghoubrial, reads:
 Re: Ronald Crabtree
 Claim No.: L90015-22
 Date of Injury: 4/9/91
 Allowed Conditions: "Allowances: lumbar sprain with secondary disc herniation of L5-S1 and contusion, left foot; left knee internal derangement"
 Medical Interrogatory On September 28, 2001 Dr. Paul J. Deppisch stated on page five of his report that the injured worker still had an ongoing and continuous problem which was related to the April 9, 1991 injury.
 [One] After reviewing the attached medical records do you accept the findings that are contained in these records?
 Yes ___ No
 [Two] Do the records indicate whether the degenerative disc disease at L5-S1 pre-existed the injury of April 9, 1991?
 ___ Yes No *Page 7 
 [Three] If the condition did pre-exist the injury of April 9, 1991, did this injury aggravate the pre-existing degenerative disc disease at L5-S1?
 ___ Yes ___ No
 Basis: ______________
 [Four] Are the drugs Pentazocine, Lexapro, and Neurontin used to treat the allowed conditions reasonable and necessary?
 Yes ___ No
 [Five] Should the cost of these drugs be paid under the allowed Workers' Compensation claims?
 Yes ___ No
 {¶ 16} 4. On February 26, 2004, relator moved that his industrial claim be additionally allowed for "degenerative disc disease at L5, S1" based upon a report, dated January 13, 2004, from Kenneth M. Cardlin, M.D. Relator's February 26, 2004 motion also requested payment for unpaid bills for prescription drugs. Relator's February 26, 2004 motion cites, among other documents, to the February 10, 2004 "Medical Interrogatory" completed by Dr. Ghoubrial.
 {¶ 17} 5. Apparently, relator's request for payment of unpaid bills for prescription drugs prompted MTD to request that a medical file review be prepared by Jose Luis Chavez, M.D. In a report dated April 20, 2004, Dr. Chavez opined:
 CLAIM ALLOWANCES: Lumbar sprain with secondary disc herniation L5-S1, left foot contusion and left knee internal derangement.
 * * *
 ISSUE: The issue for this review is to given [sic] an opinion if the following drugs, Lexapro, Neurontin and Pentazocine are appropriate for the allowed conditions of this claim. *Page 8 
 OPINION: All the data provided for review was considered as factual and was considered in the formulation of this opinion.
 As related to the drug Lexapro, (Escitalopran oxalate), it is a anti-depressant and is indicated for treatment of a major depressive disorder. Review of the indications for usage of Lexapro does not include any of the recognized conditions of this claim, therefore it's [sic] use on the case at hand is not supported, based on the recognized conditions.
 As related to the drug Neurontin, (Gabapentin), it is generally prescribed for the treatment of neuropathic type pain. This will include cases of neuritis, neuralgia's or other type pains that have a clear or suspected neurogenic origin. While no data on the file documents any noted radiculopathy to be present at the current time, the report of Dr. Kenneth Cardlin of 1-13-04, indicates complaints of low back and gluteal pain and left leg, which is suggestive, although by no means indicative of a radicular type component. Therefore, in my opinion, the use of Neurontin could be considered questionable, although not necessarily inappropriate.
 As related to the drug Pentazocine, (Talwin), it is a member of the Pentazocine [illegible] and Naloxone Hydrochloride. It is a potent analgesic, quite similar to Codeine. While its use is appropriate in the treatment of painful conditions, due to it's [sic] addictive potential, the use of Talwin should not be considered for long-term use. Based on the records provided, Mr. Crabtree has received Talwin for approximately 12-14 months and while it's [sic] use is not inappropriate, considering that Mr. Crabtree is expected to require some sort of analgesic for the duration, switching to a less addictive medication will be appropriate.
 {¶ 18} 6. Following a May 20, 2004 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "degenerative disc disease at L5-S1" based upon the January 13, 2004 report of Dr. Cardlin. Based upon the April 20, 2004 report of Dr. Chavez and the "records of Dr. Ghoubrial," the DHO's order also grants payment of Neurontin and Talwin prescribed by Dr. Ghoubrial from December 2, 2003 through February 5, 2004. *Page 9 
 {¶ 19} However, payment for Lexapro, Talwin and Neurontin prescribed by Dr. Ghoubrial prior to December 2, 2003, was denied on grounds that Dr. Ghoubrial was not relator's physician of record prior to December 2, 2003.
 {¶ 20} 7. Relator administratively appealed the DHO's order of May 20, 2004.
 {¶ 21} 8. On May 26, 2004, relator filed another motion for the payment of unpaid bills for prescription drugs:
 It is requested that all unpaid drug bills for the drugs Talwin, Neurontin, and Lexapro prescribed beginning February 4, 2004 to the present and continuing upon submission of appropriate medical evidence be paid. * * *
In support of the motion, relator cited to the February 10, 2004 "Medical Interrogatory" of Dr. Ghoubrial, and the April 20, 2004 report of Dr. Chavez.
 {¶ 22} 9. On June 21, 2004, Dr. Ghoubrial wrote to relator's counsel:
 * * * I received your letter requesting some clarification on the relationship of Mr. Crabtree's workers comp injury and his prescription for Lexapro. Mr. Crabtree suffers from Chronic and Severe pain and Sciatica, Degenerative Disc Disease. Adding Lexapro to his current medicine regimen was done because literature suggests people who suffer from chronic pain syndrome should be put on a serotonin uptake inhibitor as an adjunct to his other medications for chronic pain management. Mr. Crabtree has benefited with this treatment. It optimized his pain management regimen.
 {¶ 23} 10. Following a July 19, 2004 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order of May 20, 2004.
 {¶ 24} 11. Apparently, relator's May 26, 2004 motion prompted MTD to request that a medical records review be performed by Richard N. Kepple, M.D., who is associated with Paul C. Martin, M.D. On August 16, 2004, Dr. Kepple issued a report stating: *Page 10 
 Since 1992, Mr. Crabtree has experienced intermittent episodes of back pain and has been treated on an intermittent basis with Talwin or generic Talwin. In 2003, he changed his care to another neurosurgeon, Dr. Ghoubrail [sic], who has continued to prescribe Talwin NX or its generic, and added Neurontin and Lexapro to his treatment regimen.
 This addendum addresses the issue of the appropriateness of medication currently being prescribed to Mr. Crabtree as it relates to the April 1991 injury and the allowed conditions of this claim. According to the provided medical records, those medications include pentazocine/naloxone (generic Talwin NX), Neurontin and Lexapro. I submit that the use of pentazocine/naloxone and Neurontin 13 years after this injury is questionable, and that use of Lexapro is not indicated or necessary with respect to this claim.
 Lexapro is an antidepressant used in the treatment of a major depressive disorder. There is no allowance for a psychiatric condition in this claim and Lexapro cannot, therefore, be medically justified as indicated or necessary for the allowed conditions of this claim.
 Pentazocine/naloxone is a very potent narcotic, and it appears to be the only pain medication Mr. Crabtree's treating physicians have relied upon since the injury, except for an occasional prescription for Oxycontin. While pentazocine/naloxone may have been indicated early on in the course of Mr. Crabtree's injury, or following the surgery in August 1991, I do not believe the medical documentation supports ongoing use of this potent and highly addictive narcotic. This conclusion is based on the description of Mr. Crabtree's back pain by several physicians over the past 10 years. Both Dr. Deppisch in 2001, and Dr. Shtull in 1998, report the intensity of pain to be mild or moderate, while his own physician throughout the 1990s, Dr. Torok, routinely reported no or mild back pain, except for intermittent severe flare-ups. When severe flare-ups occurred, Talwin or its generic was routinely prescribed, to the exclusion of less potent and less addictive pain medications.
 More recently, Dr. Cardlin performed an independent medical evaluation of Mr. Crabtree in January 2004 and, once again reported only mild lower back tenderness. In summary, the medical documentation does not support repeated and/or continuous use of pentazocine/naloxone. If Mr. Crabtree is not addicted at this time, pentaxocine/naloxone should be discontinued and a non- *Page 11 
narcotic medication such as Ultram should be given a trial, in conjunction with a nonsteroidal anti-inflammatory medication.
 Neurontin is a medication indicated in the treatment of neurogenic pain. Mr. Crabtree's MRI scans have shown his left S1 nerve root to be enveloped by scar tissue from his surgery in 1991. This could be a source of irritation and, as a consequence, neurogenic pain. As I have not examined Mr. Crabtree and as no electrodiagnostic test reports were available in the provided medical records, I am reluctant to recommend that Neurontin be discontinued. It is, however, a fact that long-term use of Neurontin has not yet been demonstrated to be effective, and its use 15 years after an injury must be considered controversial.
 {¶ 25} 12. Relator's May 26, 2004 motion was heard by a DHO on August 23, 2004. Following the August 23, 2004 hearing, the DHO issued an order stating:
 Counsel present at hearing waived notice and agreed to hear the issue of payment of bills with respect to Oxycontin from 02/04/2004 to present.
 * * *
 It is the order of the District Hearing Officer that payment is granted for prescription use of Neurontin from 02/05/2004 to 08/23/2004 inclusive. Both the 04/20/2004 report of Dr. Chavez and the 08/16/2004 report of Dr. Martin question the use of this drug, but neither physician indicates that it is not reasonable and necessary for an allowed condition of this claim. In fact, Dr. Martin indicates he is reluctant to recommend discontinuing this medication.
 It is the further order of the District Hearing Officer that payment of bills for prescription use of Lexapro, Talwin and Oxycontin is denied.
 This order is based on the 08/16/2004 report of Dr. Martin who indicates that narcotics are not appropriate for this 04/09/1991 injury and that the Lexapro is for a non-allowed condition.
 {¶ 26} 13. Relator administratively appealed the DHO's order of August 23, 2004. *Page 12 
 {¶ 27} 14. The record contains an office note from Dr. Ghoubrial dated October 6, 2004, which states:
 Ronald is tolerating his Oxycontin well. He has well documented degenerative disc disease in his back. He continues to function remarkably well. He works every day. He is taking not only the Oxycontin but he is taking Neurontin for neuropathic pain as well as Lexapro. This is [sic] medication appears to keep him functional] which is our goal. He is very reasonably and very functional with his current medical regimen. When he misses a dose of his medicine, which is rare, he experiences pain for several days afterwards. His reflexes are hyperflexic on the left side today with a positive bowstring but however he appears comfortable. Certainly we are doing everything we can to manage his pain and I am very pound of what Ron has been able to do. * * *
 {¶ 28} 15. Following a November 16, 2004 hearing, an SHO issued an order affirming the DHO's order of August 23, 2004. The SHO's order states:
 The Staff Hearing Officer orders that payment is granted for prescriptions for Neurontin from February 5, 2004 through August 23, 2004. Based on Dr. Martin's August 16, 2004 report and Dr. Chavez's April 20, 2004 report. The Staff Hearing Officer finds that neither of the reports indicate that Neurontin is being prescribed for non-allowed conditions.
 The Staff Hearing Officer orders that payment for Lexapro, Oxycontin and Talwin is denied.
 This portion of the Staff Hearing Officer's decision is based on Dr. Martin's August 16, 2004 report which indicates that narcotics are not appropriate for this 1991 injury and indicates that Lexapro is not for treatment of the allowed conditions in this claim.
 {¶ 29} 16. On December 10, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 16, 2004.
 {¶ 30} 17. On May 12, 2006, relator, Ronald Crabtree, filed this mandamus action. *Page 13 
Conclusions of Law: {¶ 31} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 32} In State ex rel. Miller v. Indus. Comm. (1994),71 Ohio St.3d 229, the court articulated a three-prong test for the authorization of medical services: (1) are the medical services reasonably related to the industrial injury? (2) are the services reasonably necessary for treatment of the industrial injury? and (3) is the cost of such services medically reasonable?
 {¶ 33} In denying payment for Lexapro, Oxycontin and Talwin beginning February 2004, the commission, through its SHO, relied exclusively upon the August 16, 2004 report of Dr. Kepple (Dr. Martin). The SHO's order of November 16, 2004, points out that Dr. Kepple indicates that narcotics (Oxycontin and Talwin) are not appropriate for the 1991 injury and that Lexapro is not for treatment of an allowed condition in the claim.
 {¶ 34} Dr. Kepple's listing of the allowed conditions fails to include "degenerative disc disease at L5-S1." Moreover, there is no mention of degenerative disc disease in Dr. Kepple's report. According to relator, Dr. Kepple's report cannot constitute the some evidence upon which the commission exclusively relied to support denial of payment for Lexapro, Oxycontin and Talwin because Dr. Kepple presumably failed to consider whether those prescribed drugs were reasonably related and reasonably necessary for the treatment of all allowed conditions of the claim. The magistrate disagrees with relator's contention.
 {¶ 35} Relator's reliance upon State ex rel. Richardson v. QuartoMining Co. (1995), 73 Ohio St.3d 358, is misplaced. According to relator, the Richardson case is "virtually identical" to this case. (Relator's brief, at 6.) The magistrate disagrees. *Page 14 
 {¶ 36} In Richardson, the claimant, Jason Richardson, sustained a "lumbosacral strain" in December 1981. Ten years later, Richardson moved the commission to additionally allow the claim for "central disc herniation at L4-5 and L5-S1" and to award temporary total disability ("TTD") compensation. In support of his motion, Richardson submitted the report of Dr. David C. Ashcraft who certified TTD due to the disc condition.
 {¶ 37} Dr. Shahabi examined Richardson on the commission's behalf. Dr. Shahabi concluded in this report that Richardson had reached maximum medical improvement for the lumbosacral strain.
 {¶ 38} In Richardson, a DHO allowed the disc condition but denied TTD compensation based upon Dr. Shahabi's report. The DHO's order was administratively affirmed. In affirming this court's issuance of a writ of mandamus, the Supreme Court of Ohio in Richardson explains:
 State ex rel. Johnson v. Indus. Comm. (1988), 40 Ohio St.3d 339, 340, * * * held that the commission "[i]n determining whether to award permanent total disability, * * * must consider every allowed condition." (Emphasis added.) That temporary total disability is at issue does not compel a different result.
 Dr. Shahabi's disability conclusions were based on the "allowed condition recognized for lumbosacral strain." This claim, however, is also allowed for "central disc herniation at L4-5 and L5-S1." Reliance on [Dr.] Shahabi's report demonstrates that the commission did not consider claimant's more severe disc condition before denying temporary total disability compensation. Accordingly, the commission abused its discretion in denying compensation without considering all allowed conditions.
Id. at 359.
 {¶ 39} In Richardson, it is significant that Dr. Ashcraft's report (which accompanied the motion) certified TTD due to the disc condition. *Page 15 
 {¶ 40} Here, relator's May 26, 2004 motion at issue cited to the February 10, 2004 "Medical Interrogatory" of Dr. Ghoubrial and the April 20, 2005 report of Dr. Chavez. Neither report indicates that "degenerative disc disease at L5-S1" is an allowed condition or that the prescribed drugs at issue are reasonably related and reasonably necessary for the treatment of such condition.
 {¶ 41} Moreover, even the June 21 and October 6, 2004 office notes of Dr. Ghoubrial fail to causally link the prescribed drugs at issue to the allowed condition "degenerative disc disease at L5-S1." Dr. Ghoubrial states in his office note of June 21, 2004, that relator "suffers from Chronic and Severe pain and Sciatica, Degenerative Disc Disease." In his October 6, 2004 office note, Dr. Ghoubrial states that relator "has well documented degenerative disc disease in his back." However, the industrial claim is not allowed gene1rally for degenerative disc disease. The claim is only allowed specifically for "degenerative disc disease at L5-S1." Nowhere in his office notes does Dr. Ghoubrial link the prescribed drugs at issue to the allowed condition.
 {¶ 42} Here, the commission considered the allowed conditions that relator's medical evidence presented as being relevant to the issue of payment for the prescribed drugs. It was relator who failed to present medical evidence showing that the newly allowed condition "degenerative disc disease at L5-S1" is causally linked to the prescribed drugs at issue. Clearly, the commission did not abuse its discretion by relying exclusively upon Dr. Kepple's August 16, 2004 report that fails to list or consider the newly allowed condition of the claim. *Page 16 
 {¶ 43} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1